FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Jan 03 2024

KEVIN P. WEIMER , Clerk

By: s/Kari Butler
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

  v.

RYAN MEYUNG,

    Defendant.

CRIMINAL ACTION FILE NO.

4:22-CR-20-WMR-WEJ-1

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

On June 21, 2022, the grand jury returned an eight-count Indictment [1] against defendant, Ryan Meyung, charging him with production of child pornography regarding six minor victims, transportation of child pornography, and possession of child pornography.  Defendant filed a Motion to Suppress Statements [25] and two Motions to Suppress Evidence [26, 27].  The undersigned conducted a hearing on these Motions on June 1, 2023 [32], which has been transcribed [35] ("Tr.").  Based on the testimony and documents received at that hearing, and after consideration of the briefs of counsel, the undersigned **RECOMMENDS** that Mr. Meyung's Motion to Suppress Statements [25] and his Motions to Suppress Evidence [26, 27] be **DENIED**.

I.    **STATEMENT OF FACTS**[1]

On December 5, 2021, the Hamilton County Sheriff's Office (HCSO) received a report of child sexual abuse listing the suspect as the defendant, Ryan Meyung.  (Tr. 5.)  A child, identified in the Indictment as "Minor 5," was the alleged victim.  (Id.)  During a forensic interview on December 15, 2021, Minor 5 disclosed details of the sexual assault allegedly committed by Mr. Meyung and shared that Mr. Meyung had communicated with him on several social media applications, including Facebook, TikTok, Instagram, and Snapchat, as well as by text message and Facetime.  (Aff. in Supp. of App. for SW, at 4, filed as Gov't Ex. 4.)

Minor 5's father spoke with investigators on December 15 and 16, 2021, and reported that Mr. Meyung had purchased a cell phone for Minor 5, that Minor 5 communicated with defendant by text message and social media applications, that he (Minor 5's father) had found "alarming text messages" between Mr. Meyung and Minor 5 and a sexually explicit photograph on one of Minor 5's cell phones, and that he (Minor 5's father) suspected Minor 5's cell phone may contain images

---

[1] The Court viewed the video footage placed into evidence and referenced herein via a file sharing link provided by the United States Attorney's Office.

and videos of interest to the investigation.  (Aff. in Supp. of App. for SW, at 5-6; see also Tr. 5-7.)  On December 17, 2021, HCSO Detective Danny Stone obtained a warrant for Mr. Meyung's arrest on state child rape charges.  (Tr. 8-9; see also Arrest Warrant, filed as Gov't Ex. 1.)

On December 17, 2021, at about 1:30 a.m., Detective Stone (accompanied by two deputies) located Mr. Meyung in his Ford E350 bus, out of which he was living, at Boyd's Motor Speedway, located on the Georgia-Tennessee border.  (Tr. 8-9, 28.)  While executing the arrest warrant, Detective Stone asked Mr. Meyung for consent to look inside the bus to ensure that no children were present, which he provided.  (Id. at 10, 36.)  Detective Stone looked inside the bus and found no children.  (Id. at 11, 34-35, 36.)  While Detective Stone was inside the bus, Mr. Meyung (who was shirtless) asked him to retrieve a t-shirt for him because it was cold outside, and Detective Stone did so.  (Id. at 10-11, 35-36.)  Detective Stone had difficulty locking the bus and was concerned about leaving it unsecured once everyone departed the scene; therefore, he asked Mr. Meyung if he would like to take any belongings with him.  (Id. at 11, 25, 35, 36-37.)  Mr. Meyung asked Detective Stone to collect his cell phone, which he did.  (Id. at 11.)  Detective Stone

also retrieved a laptop and two chargers from the bus to protect them from potential theft.  (Id. at 11-12, 37.)[2]

After stepping out of the bus, Detective Stone spoke with Mr. Meyung and explained why he was under arrest.  (See Body Camera Footage of Arrest at 6:30, filed as Def.'s Ex. 3; see also Tr. 12.)  Detective Stone informed Mr. Meyung that he would follow up with him to discuss the allegations against him in the morning unless he wanted to speak now.  (Tr. 12, 30.)  Mr. Meyung stated that he wanted to talk now.  (Id. at 12, 13-14, 28-29, 30.)[3]

A deputy transported Mr. Meyung to the Hamilton County East Annex. Detective Stone's interview of the defendant began at 2:45 a.m. on December 17, 2021, and ended at 5:30 a.m.  (Tr. 13, 16, 32.)  The videotape of that interview

---

[2] Detective Stone did not try to open or access the cell phone or the laptop. (Tr. 12.)  As discussed infra, Detective Stone seized these items for their potential evidentiary value.

[3] About 10 to 11 minutes elapsed between Detective Stone's first encounter with the defendant and his placement in a vehicle for transport to the HCSO.  (Tr. 28.)  It took around 12 to 15 minutes to travel from Boyd's Speedway to the Hamilton County East Annex.  (Id. at 31.)  The defendant contends that videotape from the camera in the back of the patrol car shows that he struggled to stay awake during the drive.  The defendant also contends that he can be heard slurring his words on the videotape.  (See, e.g., Def.'s Ex. 1, at 16:05.)  However, it does not appear that the defendant actually fell asleep in the back of the patrol car.  Moreover, after listening to Mr. Meyung speak on the various videotapes placed in the record, his voice sometimes sounds indistinct whether he is alert or sleepy.

4

shows that the defendant appears to have fallen asleep for about two-three minutes immediately before the interview began. (Gov't Ex. 3, at 42:00–44:25.)

The videotape shows that as Detective Stone entered the room, the defendant sat upright, and the Detective asked him if he were alright. (Gov't Ex. 3, at 44:30.) The Detective handed the defendant some water, and he replied that he was tired. (Id. at 44:32.)   Detective Stone, joined by HCSO Sergeant Mike Thompson, advised the defendant of his Miranda rights, both orally and in writing, using an HCSO "Admonition and Waiver" form (Gov't Ex. 2). (Tr. 12-13, 28.)   The Admonition and Waiver form lists the Miranda rights, reflects the defendant's signature, and lists his date of birth, address, and education level (high school graduate).[4]  In response to the question, "Are you under the influence of a drug or Intoxicant?", the defendant wrote "No" on the form. (Gov't Ex. 2; see also Tr. 14, 33.)  When asked orally whether he was under the influence of alcohol or drugs, Mr. Meyung responded, "Lack of sleep." (Gov't Ex. 3, at 49:35–49:40.)

Before waiving his rights and signing the form consenting to an interview, Mr. Meyung asked Detective Stone several questions about the implications of

---

[4] In the videotape, Mr. Meyung added that he had taken some classes at a technical school after graduation from high school. (Gov't Ex. 3.)

waiving his <u>Miranda</u> rights and signing the consent form, which the Detective answered.  (Gov't Ex. 3, at 49:00–52:40; <u>see also</u> Tr. 13, 17.)  Detective Stone testified that he did not have any reason to think that Mr. Meyung did not understand his rights. (Tr. 15.) The Detective added that he had no reason to think that Mr. Meyung was under the influence of a drug or medication or that he was mentally incompetent.  (<u>Id.</u>)  Detective Stone testified that neither he nor anyone else used any physical force against Mr. Meyung to pressure him to waive his rights or threatened him in any way.  (<u>Id.</u> at 15-16.)  The Detective believed that the defendant answered his questions voluntarily.  (<u>Id.</u> at 16.)

Finally, Detective Stone did not believe that any claimed lack of sleep impacted the defendant's ability to perceive, understand, or answer questions.  (Tr. 50.)  Although the defendant asserts that the videotape shows that he seemed confused at times during the discussion of his rights, it also shows that Detective Stone and his colleague patiently answered his questions and explained what was happening.  (Gov't Ex. 3, at 45:15–52:30.)  Mr. Meyung expressed during the interview that he was exhausted and "really just want to sleep." (<u>Id.</u> at 58:30.) However, the videotape shows that the defendant remained alert during the

6

interview and answered questions continuously.[5]  Moreover, he did not fall asleep again after the interview concluded while he awaited a deputy to transport him to the jail.  (See generally id.)

At the conclusion of the interview, a deputy transported the defendant to the HCSO's Silverdale Correctional Facility.  (Tr. 17.)  At this time, Detective Stone seized the defendant's cell phone, the laptop, and the two chargers as evidence.  (Id. at 38-39.)  He was concerned that if he returned these items to the defendant that images or videos contained on the cell phone or laptop would be erased or destroyed.  (Id. at 51.)

In a separate investigation by the Chattanooga Police Department (CPD), Investigator Kayla Balinger learned on December 16, 2021, of three separate allegations of child sexual assault involving Mr. Meyung, including assaults occurring in his Ford E350 bus.  (Tr. 18, 54-55.)  CPD obtained a state search warrant for that vehicle on December 21, 2021, executed it on December 22, 2021, and seized several SD memory cards (among other items) as evidence.  (Id. at 19-

_____

[5] According to the Detective, Mr. Meyung denied during the interview that he had sexually assaulted Minor 5, but corroborated some of Minor 5's disclosures and made other statements relevant to other minor victims listed in the Indictment. (Tr. 16.)

20, 55-59; <u>see also</u> CPD Search Warrant, filed as Gov't Ex. 8; photograph of defendant's bus, filed as Gov't Ex. 7.)[6]

On December 21, 2021, Mr. Meyung made two telephone calls while being housed at the HCSO Silverdale Corrections Facility. (Tr. 19.) During those calls, Mr. Meyung provided account log-in information for his cell phone to the other party on the line and asked that individual to log in to his account and "block, erase, or black out" the contents of his cell phone. (<u>Id.</u>)

On January 13, 2022, Special Agent James Rives of the U.S. Department of Homeland Security, Homeland Security Investigations (HSI), reviewed the contents of Minor 5's cell phone and found text messages between Mr. Meyung and Minor 5 about "shower[ing]" and "Snap." (App. for SW at 12, filed as Gov't Ex. 4.) On January 14, 2022, United States Magistrate Judge Christopher H. Steger of the United States District Court for the Eastern District of Tennessee issued a warrant for the search of Mr. Meyung's cell phone, laptop, and other electronics seized during the investigation. (<u>See</u> SW, Attach. A, filed as Gov't Ex. 4; <u>see also</u>

---

[6] The CPD executed the search warrant at a secured impound lot to which the Ford E350 bus had been towed from Boyd's Motor Speedway. (Tr. 18-19, 56.) Detective Stone aided Officer Balinger in locating the defendant's vehicle. (<u>Id.</u> at 18-19, 39-40.)

Tr. 20-21.)  Special Agent Rives did not review the contents of Mr. Meyung's electronic devices until after he obtained the search warrant.  (Tr. 21.)  The images retrieved from Mr. Meyung's devices showed him engaged in sex acts with children (some of whom are listed in the Indictment).  (Id.)

As the events discussed above were occurring, the defendant remained in custody at the HCSO Silverdale Correctional Facility on state charges.  (Tr. 21-22.)  According to Detective Stone, the HCSO was concerned that Mr. Meyung might be involved in gang activity (or become a victim of such activity) after receiving reports from him and his family that other inmates were stealing his commissary and threatening him with violence.  (Id. at 23.)  Therefore, on January 4, 2022, correction officers photographed Mr. Meyung's tattoos on his arms, legs, chest, stomach, and back pursuant to the HCSO's security threat group (STG) management policy.  (Id. at 23-24, 47, 52; see also STG Policy, filed as Gov't Ex. 5.)[7]  Officers did not photograph Mr. Meyung's private areas, and he was not

_____

[7] The STG policy directs that an inmate be assessed regarding his level of involvement in dangerous activity or gang membership so that correctional officers can limit his interaction with others to prevent escapes, assaults, or extortion of other inmates.  (Tr. 22.)  The facility takes photographs of an inmate during booking, which may include photographs of his tattoos.  (Id.)  If there is reason to believe that an inmate may be involved in STG activity, additional photographs

required to remove his pants or underwear during the session.  (Id. at 24, 48; see also photographs of defendant's tattoos, filed as Gov't Ex. 6.)  At the conclusion of the STG assessment, officers determined that Mr. Meyung did not meet the minimum mandate to be validated as a gang member and no report was filed as a result.  (Tr. 24-25.)

## II.   DISCUSSION

Mr. Meyung filed Motions to Suppress his post-arrest statements [27], evidence seized from his vehicle at the time of his arrest [26], and photographs of his tattoos taken eighteen days after his arrest [25].  The Court begins with the Motions to Suppress Evidence.

### A.   Motions to Suppress Evidence

#### 1.   Evidence Seized from the Defendant's Vehicle [26]

Detective Stone seized the defendant's cell phone, his laptop, and two chargers from his E350 bus during his arrest on December 17, 2021.[8]  The Fourth

_____

may be taken or searches or interviews may be conducted.  (Id.)  An inmates must comply with directions that officers view or photograph his tattoos.  (Id. at 49.)

[8] The Court focuses on the cell phone and the laptop because the chargers contain nothing of evidentiary value.  Although Detective Stone testified that he did not seize the cell phone or the laptop until after he completed questioning the defendant, as a practical matter these items were seized at the time of the

Amendment protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  The burden of proof as to the reasonableness of a search or seizure rests with the prosecution.  <u>United States v. Freire</u>, 710 F.2d 1515, 1519 (11th Cir. 1983).

Given there was no search warrant here, the Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable under the Fourth Amendment. <u>Vale v. Louisiana</u>, 399 U.S. 30, 34 (1969).  Some of the recognized exceptions that authorize an officer to seize an item include consent, plain view, and exigent circumstances.  <u>See</u> <u>United States v. Chappell</u>, No. 1:10-CR-531-WSD-ECS-1, 2011 WL 5352947, at *5 (N.D. Ga. Nov. 4, 2011).  The Government argues that all of those exceptions to the warrant requirement, as well as the inevitable discovery exception, apply to make the warrantless seizure here lawful.  (Gov't Br. 9-13.)  Mr. Meyung disagrees.  (Def.'s Supp. Br. [44] 8-10.)  The Court addresses each of these exceptions below.

_____

defendant's arrest because the Detective meaningfully interfered with Mr. Meyung's possessory interest in those items.  <u>See</u> <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984) (seizure of personal property occurs for purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interest in that property).

11

a)      **<u>Consent</u>**

A warrantless search pursuant to voluntary consent is one of the exceptions to the warrant requirement.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973). The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority, but rather was given freely and voluntarily.  <u>United States v. Massell</u>, 823 F.2d 1503, 1507 (11th Cir. 1987).  In other words, consent to conduct a search is voluntary if it is the product of an "'essentially free and unconstrained choice.'"  <u>United States v. Purcell</u>, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting <u>Schneckloth</u>, 412 U.S. at 225).  Voluntariness of consent depends on the totality of the circumstances.  <u>Id.</u> In evaluating voluntariness, district courts are directed to examine several factors, including "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found."  <u>Id.</u>

First, in considering the totality of the circumstances here, the undersigned reports that the Detective did not engage in coercive police procedures.  <u>See United States v. Drayton</u>, 536 U.S. 194, 204 (2002) (no coercion when "there was no application of force, no intimidating movement, no overwhelming show of force,

12

no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice"). Detective Stone did not claim to have a search warrant for the E350 bus. Likewise, Mr. Meyung was not threatened or promised anything in return for consenting to Detective Stone's entry into the bus to search for children.

Second, with regard to cooperation, there is no indication that Mr. Meyung was uncooperative at any point. Indeed, he asked Detective Stone to retrieve both his cell phone and a t-shirt from the E350 bus after granting him consent to enter it. Third, although Detective Stone did not inform Mr. Meyung of his right to refuse consent to his entry into the bus, the Government is not required to do so. Schneckloth, 412 U.S. at 231-32.

Fourth, with regard to Mr. Meyung's education and intelligence, he wrote on the Miranda form that he was a high school graduate and added verbally that he had attended some classes at a technical school. There is no evidence that he has any limitations that would have vitiated that consent. Finally, it is safe to assume that Mr. Meyung requested that Detective Stone retrieve his cell phone and t-shirt because he believed that no incriminating evidence would be found in the bus. United States v. Barrueta, No. 208-CR-91-FTM-29SPC, 2008 WL 4642793, at *15 (M.D. Fla. Oct. 17, 2008) ("The fact that the Defendant so readily agreed to the

13

search is a strong indication the Defendant did not believe anything illegal would be found . . . .").  In sum, Mr. Meyung did not acquiesce to any claim of lawful authority and he gave consent freely and voluntarily for Detective Stone to enter his E350 bus.

### b)   **Plain View**

With regard to the "plain view" exception, an officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are met:  "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and, (2) the incriminating character of the item is immediately apparent."  United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006).

Detective Stone executed a lawfully obtained arrest warrant.  He did not have a search warrant.  However, as noted above, the Detective obtained consent to enter the E350 bus.  When he entered, Detective Stone saw in plain view both the cell phone (which defendant had requested) and the laptop.  Thus, Detective Stone was lawfully located in the place from which the seized object could be plainly viewed and had a lawful right of access to the object itself.  Thus the first Smith requirement was met.

14

As for the second <u>Smith</u> requirement, the "immediately apparent" language does not require a law enforcement officer to "'know' that certain items are contraband or evidence of a crime."  <u>Texas v. Brown</u>, 460 U.S. 730, 741 (1983). Indeed, "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity."  <u>Payton v. New York</u>, 445 U.S. 573, 587 (1980). With regard to probable cause, the Supreme Court holds as follows:

> [P]robable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," <u>Carroll v. United States</u>, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.  A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.  <u>Brinegar v. United States</u>, 338 U.S. 160, 176, 69 S. Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

<u>Brown</u>, 460 U.S. at 742.  Additionally, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  <u>Adams v. Williams</u>, 407 U.S. 143, 149 (1972).   In determining whether probable cause exists, the Court "'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which

reasonable and prudent men, not legal technicians, act.'" <u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983) (quoting <u>Brinegar</u>, 338 U.S. at 175).

Given these standards, the undersigned reports that Detective Stone knew that the defendant had used electronic devices (such as a cell phone or laptop) capable of sending photographs, transmitting text messages, or accessing social media applications (such as Facetime, Facebook, TikTok, Instagram, and Snapchat) to interact with Minor 5. Detective Stone's training, experience, and the investigation to date gave him probable cause to believe that evidence of illegal sexual activity with minors or child pornography would be on defendant's cell phone or laptop. Thus, he lawfully seized these items. <u>See</u> <u>United States v. Vallimont</u>, 378 F. App'x 972, 974 (11th Cir. 2010) (per curiam) ("The warrantless seizure of Vallimont's computer was permissible under the 'plain view' doctrine because (1) Investigator David Griffin was lawfully present in the child's living room to investigate sexual abuse allegations; (2) Vallimont's computer was plainly visible on the living room coffee table; and (3) the incriminating character of the computer was immediately apparent based upon the child's statements that Vallimont had child pornography on that computer."). In sum, Detective Stone was in a place he was lawfully authorized to be, and the incriminating nature of the

16

evidence (i.e., the cell phone and laptop) was readily apparent. Thus, the plain view exception applies.

### c)    Exigent Circumstances

Under the exigent circumstances doctrine, an officer may conduct a warrantless seizure "when probable cause has been established to believe that evidence will be removed or destroyed before a warrant can be obtained." United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990); see also United States v. Bradley, 644 F.3d 1213, 1262 (11th Cir. 2011) ("Exigent circumstances exist 'when there is danger that . . . evidence will be destroyed or removed.'" (quoting United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991))). The test for exigency is an objective one, asking "if 'the facts . . . would lead a reasonable, experienced agent to believe that evidence *might* be destroyed before a warrant could be secured.'" Bradley, 644 F.3d at 1262 (quoting Tobin, 923 F.2d at 1510). The exigent circumstances exception to the warrant requirement is "particularly compelling" in cases concerning electronic files because they can be easily erased. United States v. Babcock, 924 F.3d 1180, 1194 (11th Cir. 2019).

The exigent circumstances exception is applicable in this instance and justifies the seizure of the defendant's cellphone and laptop. There was probable cause that the electronics contained evidence of a crime and reasonable concerns

17

that the evidence would be destroyed before obtaining a warrant. The arresting officers had probable cause to believe that evidence of a crime would be found on Mr. Meyung's cell phone and laptop. The officers were executing an arrest warrant on the defendant for the criminal offense of child rape based on interviews with Minor 5 and their family members that included allegations of "alarming" electronic communications between Minor 5 and Meyung and grooming activity using electronic devices. (See Gov't Ex. 4.) Thus, there was a substantial chance that evidence of criminal activity would be found on Mr. Meyung's cell phone and laptop.

Detective Stone also had valid concerns that the evidence from the cell phone and laptop would be destroyed before he would be able to obtain a search warrant. First, Detective Stone had concerns due to the inability to secure Mr. Meyung's bus before leaving the scene. Detective Stone was concerned that leaving the cell phone and laptop in the unsecured bus would risk losing valuable evidence due to theft or other removal. (Def.'s Ex. 3, at 3:35.) Second, Detective Stone was concerned that incriminating evidence would be deleted from the cell phone and laptop if they were not seized. (Tr. 51.) Courts have recognized that law enforcement officers can be reasonably concerned that evidence of sexual exploitation of children will be deleted from electronics when defendants learn of

investigations about them.  See Babcock, 924 F.3d at 1195; Vallimont, 378 F. App'x at 974.  The reasonableness of Detective Stone's concern is highlighted by Mr. Meyung's request in the days following his arrest that another individual delete information from his cell phone.  (Gov't Ex. 4, at 8.)

Accordingly, exigent circumstances justified Detective Stone's seizure of the cell phone and laptop—which, notably, were not searched until receipt of a federal search warrant for their contents.[9]  See United States v. Somers, No. 4:20-CR-005-JPB-WEJ, 2022 WL 225622, at *5-6 (N.D. Ga. Jan. 26, 2022) ("The Court thus finds that exigent circumstances existed based on the risk that evidence on Defendant's cellphone would be destroyed during the search warrant's execution . . . Accordingly, the seizure of Defendant's cellphone was permissible under the exigent circumstances exception to the warrant requirement."); United States v. Marsh, No. 2:19-CR-566-ACA-GMB, 2021 WL 4318313, at *10 (N.D. Ala. July 27, 2021) (upholding the warrantless seizure of the defendant's cellphone on

---

[9] Officers here did not "conduct a warrantless search.  Instead, faced with the potential destruction of evidence, they did exactly what [the Eleventh Circuit] suggests they should have done—they seized the phone [and laptop] 'to prevent the loss or destruction of its contents,' and then obtained a warrant before searching through it."  Bradley, 924 F.3d at 1195 (quoting United States v. Hernandez-Cano, 808 F.2d 779, 782 (11th Cir. 1987)).

19

exigent circumstances grounds because law enforcement "had reason to believe that [the defendant], their primary suspect, would delete any incriminating evidence on his phone before a warrant could be obtained"), R. & R. adopted, No. 2:19-CR-566, 2021 WL 4311020 (N.D. Ala. Sept. 22, 2021).

### d) <u>Inevitable Discovery</u>

Under the exception for "inevitable discovery," the Government may introduce evidence that was obtained by an illegal search or seizure if it can establish a "reasonable probability that the evidence in question would have been discovered by lawful means." <u>Jefferson v. Fountain</u>, 382 F.3d 1286, 1296 (11th Cir. 2004). The Government must also establish that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." <u>Id.</u> The Government must prove to the Court that the evidence would have been lawfully recovered through a preponderance of the evidence. <u>United States v. Watkins</u>, 10 F.4th 1179, 1181-84 (11th Cir. 2021).

Here, the record demonstrates that separate and apart from HCSO's investigation, with its arrest of Mr. Meyung and seizure of his cell phone and laptop from the bus on December 17, 2021, CPD was already investigating him for sexual assaults of children in that bus, that it was preparing a search warrant for the bus and its contents, and that it obtained and executed a search warrant for that bus and

20

its contents several days later—a search that resulted in the seizure of numerous electronic devices.  (Tr. 54-58; <u>see also</u> Gov't Ex. 8.)  HSI also obtained a federal search warrant (Gov't Ex. 4) for the devices found in the bus.  Accordingly, even if HCSO's search or seizure had been unlawful, it is more likely than not that the devices in question would have been recovered during a separate, lawful investigation.  Thus, the inevitable discovery doctrine also compels denial of Mr. Meyung's Motion to Suppress the evidence recovered from the bus.  <u>See</u> <u>United States v. Price</u>, No. 17-CR-301 (NGG), 2017 WL 4838307, at *7 (E.D.N.Y. Oct. 23, 2017) ("[T]he court concludes that, even if the seizure of the two telephones was not lawful, there was sufficient independent evidence that would lead to a magistrate judge inevitably issuing a warrant to seize the telephones.  As a result, the two telephones, and the evidence obtained through those phones, are not subject to suppression.").

> ## 2. <u>Delay in the Search of Defendant's Cell Phone/Laptop</u>

Even if his cell phone and laptop were lawfully seized, Mr. Meyung argues that the Government waited too long to apply for the search warrant for them; thus, he contends that the contents of the search should be suppressed.  The Government opposes this contention, asserting that there was no unreasonable delay.  (Gov't Br. 13-16.)

Although it is lawful to seize items like cell phones based on probable cause to believe that they contain contraband, a seizure lawful at its inception can nevertheless become unlawful if its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable seizures.  Jacobsen, 466 U.S. at 121-22.  A temporary warrantless seizure supported by probable cause is reasonable as long as "the police diligently obtained a warrant in a reasonable period of time."  Illinois v. McArthur, 531 U.S. 326, 334 (2001).

The delay here between the seizure of Mr. Meyung's cell phone and laptop and the application for a warrant to search them was 28 days.  The defendant argues that this was too long, citing United States v. Mitchell, 565 F.3d 1347 (11th Cir. 2009) (per curiam) (21-day delay in seeking search warrant was unreasonable).

In United States v. Laist, 702 F.3d 608 (11th Cir. 2012), the Circuit made clear that there is no bright-line rule concerning how long of a delay is unreasonable. To the contrary, Laist emphasizes the very case-specific nature of this analysis and identifies a number of factors that courts should consider in balancing the interests of the government and the defendant.  Those factors include:  (1) the significance of the interference with the defendant's possessory interest, (2) the duration of the delay, (3) whether the defendant consented to the seizure, (4) the government's

22

legitimate interest in holding the property as evidence, and (5) the government's diligence in pursuing a search warrant. Id. at 613-14. The government's diligence, in turn, can be measured by a number of considerations, which may include: (1) the nature and complexity of the investigation, (2) whether "overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case," and (3) the quality of the warrant application and the amount of time it should take to prepare it. Id. at 614 (internal citations and quotation marks omitted). These factors "are by no means exhaustive." Id.

Applying these factors here shows that the 28-day delay was not unreasonable. There was no significant interference with the defendant's possessory interest through seizure of his cell phone and laptop because he was in custody and could not have physically or legally possessed electronics. See, e.g., United States v. Shaw, 531 F. App'x 946, 949 (11th Cir. 2013) (per curiam) (noting the defendant could not have physically possessed the phone during the contested delay in obtaining a search warrant); United States v. Boyzo-Mondragon, No. 1:19-CR-115-TWT-LTW, 2021 WL 1381155, at *10 (N.D. Ga. Feb. 5, 2021) (noting lack of authority supporting contention that defendant had any possessory interest in a phone he could not have legally possessed while in custody). Second, the 28-day delay here was not much longer than the 21-day delay upheld in Mitchell. As

23

for the third factor, Mr. Meyung did not consent to the seizure, but the fourth factor favors the Government:  It had a legitimate interest in holding the defendant's cell phone and laptop as evidence, expecting them to contain texts, pictures, location tags, or call logs relating to his alleged crimes against children.  See United States v. Lawson, No. 3:21-CR-00006-TCB-RGV, 2022 WL 1134721, at *16 (N.D. Ga. Feb. 2, 2022), R. & R. adopted sub nom. United States v. Middleton, 595 F. Supp. 3d 1277 (N.D. Ga. 2022) (fourth Laist factor strongly weighed in the government's favor because it had a legitimate interest in holding the property as evidence).

Finally, as for the fifth factor–the Government's diligence–the Court takes note of the nature and complexity of the investigation which led to the instant Indictment.  As the Government correctly points out, law enforcement officers acted with great urgency during the investigation.  The search warrant (Gov't Ex. 4) outlines the numerous state and federal law enforcement agencies, including CPD, HCSO, and HSI, actively investigating the case during the 28-day period.  Investigators were continuing to interview potential victims, completing searches of Mr. Meyung's bus and a victim's residence, and investigating obstruction and evidence tampering related to the crimes.  (Gov't Br. 16.)  Given the complexity of the case and the number of agencies involved, it was not unreasonable for there to be a 28-day delay between the seizure of the defendant's cell phone and laptop and

24

issuance of the search warrant.  "This is a far cry from delaying the warrant process because [the agents in this investigation] 'didn't see any urgency.'"  United States v. Vedrine, No. 20-13259, 2022 WL 17259152, at *4 (11th Cir. Nov. 29, 2022) (per curiam) (citing Mitchell, 565 F.3d at 1351).   In similar cases involving complex matters, delays like the 28-day delay here were found to be reasonable. See Laist, 702 F.3d at 616 (25-day delay in obtaining a search warrant for a computer was reasonable); Thomas v. United States, 775 F. App'x 477, 489 (11th Cir. 2019) (per curiam) (33-day delay in obtaining a search warrant for a computer was reasonable); United States v. Atkins, 702 F. App'x 890, 896 (11th Cir. 2017) (per curiam) (30-day delay in obtaining a warrant to search a cell phone was reasonable); United States v. Vallimont, 378 F. App'x 972, 976 (11th Cir. 2010) (per curiam) (45-day delay in obtaining a warrant to search a computer was reasonable).

Accordingly, the undersigned reports that the 28-day delay here between the seizure of Mr. Meyung's cell phone and laptop and the Government's application for, and receipt of, a warrant authorizing their search was reasonable.  Therefore, the defendant's Motion to Suppress any evidence found during the search of his cell phone and laptop because of the delay in seeking the warrant should be denied.

Even if the Court were to find that the Government waited too long to apply for a warrant to search the cell phone and laptop, Mr. Meyung's Motion to Suppress would still fail because the evidence was obtained by law enforcement acting in reasonable reliance on the validity of the search warrant. Under United States v. Leon, 468 U.S. 897 (1984), evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate is not subject to the exclusionary rule. Id. at 925. The Leon "good-faith exception" applies in all but four narrow circumstances: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing judge wholly abandoned his judicial role; (3) where the search warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending on the circumstances of the particular case, a warrant was so facially deficient (i.e., in failing to particularize the place to be searched or the things to be seized) that the executing officers could not reasonably presume it to be valid. See United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing Leon, 468 U.S. at 922). Under the good-faith exception to the exclusionary rule, "suppression is necessary only if the officers were dishonest or reckless in

26

preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." United States v. Robinson, 336 F.3d 1293, 1296 (11th Cir. 2003) (internal quotation marks and citation omitted). While the standard for applying the Leon good-faith exception is one of "objective reasonableness," "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search.'" Id. (quoting Leon, 468 U.S. at 922).

    None of the four limited circumstances referenced in Leon apply here, and Mr. Meyung does not contend otherwise. There is no allegation—let alone evidence—that the agents were dishonest or reckless in preparing the search warrant affidavit or that they could not have harbored an objectively reasonable belief in the existence of probable cause. Nor is there an allegation—let alone evidence—that the warrant was issued by other than a detached and neutral magistrate. Accordingly, the Leon good-faith exception to the exclusionary rule applies, and suppression would be inappropriate even if this Court were to find that agents waited too long after seizure of the cell phone and laptop to apply for a warrant to search them.

### 2.   Photographs of the Defendant's Tattoos [27]

HCSO personnel did not photograph Mr. Meyung's tattoos as part of the booking process; instead, 18 days after the defendant's arrest, law enforcement photographed his numerous tattoos.   In one of the pictures, the defendant's underwear is visible.  He was wearing a jail jump suit and had to lower it for the photographer to capture some images.  Most of the defendant's tattoos are on his hands, arms, or legs; however, Mr. Meyung has two tattoos that are close together on his chest and one on his back.  These tattoos are only visible if the defendant removes his shirt.  (See Gov't Ex. 6.)

Officers here photographed the defendant's body to capture images of his tattoos without a warrant; therefore, he asserts that the photographs should be suppressed because he was compelled to remove clothing, pose, and expose his tattoos in what amounted to a warrantless search in violation of his Fourth Amendment rights.  (Def.'s Br. 14; Def.'s Supp. Br. 11-15.)  The Government argues that these photographs were taken pursuant to the HCSO's STG Management policy.  (Gov't Resp. 21-22; STG filed as Gov't Ex. 5.)   The defendant responds that the HCSO did not follow its policy here, as he was not assessed as a member of a threat group at booking; his tattoos were not

28

photographed at that time; and he was not investigated within five days of booking as required.  (Def.'s Br. 17.)[10]

Whether the HCSO correctly applied its STG policy is immaterial, given that the officers here conducted a reasonable search of this pretrial detainee under <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979).  Because what the officers did here was not violative of the defendant's Fourth Amendment rights, the photographs of his tattoos should not be suppressed.

The facility in <u>Bell</u> primarily housed pretrial detainees.  It had a policy that required inmates to expose their body cavities for visual inspection as a part of a

---

[10] If the STG policy is a pretext and the officers took these photographs to confirm testimony from one or more of the minor victims about tattoos they had observed on Mr. Meyung's body, then these photographs could raise an issue under the Fifth Amendment's privilege against self-incrimination.  However, such a challenge is foreclosed by the Supreme Court's opinion in <u>Schmerber v. California</u>, 384 U.S. 757 (1966), which states as follows:

> [B]oth federal and state courts have usually held that [the privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.  The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it.

<u>Id.</u> at 764 (footnote omitted).

29

strip search conducted after every contact visit with a person from outside the institution. 441 U.S. at 524, 558. In rejecting a challenge to that policy, the Court wrote as follows:

> [A]ssuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility, we nonetheless conclude that these searches do not violate that Amendment. The Fourth Amendment prohibits only unreasonable searches, and under the circumstances, we do not believe that these searches are unreasonable.

Id. at 558 (internal citations omitted). In evaluating Fourth Amendment claims in this context, a court must consider (1) the scope of the particular intrusion, (2) the manner in which it is conducted, (2) the justification for initiating it, and (4) the place in which it is conducted. Id. at 559.

As for the first factor, the scope of the particular intrusion here was minimal. As noted above, most of the defendant's tattoos are on his hands, arms, or legs. They would be seen by others if the defendant was dressed for warm weather in a short-sleeve shirt and shorts. The Supreme Court has long held that the Fourth Amendment does not protect what "a person knowingly exposes to the public." Katz v. United States, 389 U.S. 347, 351 (1967). As for the tattoos on Mr. Meyung's chest and back, they are only visible if he is shirtless. As shown in the arrest video, Mr. Meyung was shirtless when he encountered the officers; moreover,

these tattoos would be seen by others if the defendant were in a swimsuit.  Like fingerprinting, photographing identifying marks such as tattoos "involves none of the probing into an individual's private life and thoughts that marks an interrogation or search." United States v. Dionisio, 410 U.S. 1, 15 (1972).  Although in one photograph Mr. Meyung's underwear is visible, his private parts were not exposed. In sum, the officers required Mr. Meyung to be no more exposed than necessary to permit photographing of his tattoos.

As for the second factor, the manner in which the search was conducted, there is no evidence that officers were abusive to Mr. Meyung when taking the photographs.  As for the third factor, the justification for initiating it, the HCSO was either engaged in a belated attempt to follow their STG policy or they needed photographs to confirm tattoos identified by one or more of the minor victims. Either way, taking of the photographs was justified.

As for the fourth and final factor, the place in which the photographs were taken, they were taken in a jail.  Mr. Meyung had a diminished expectation of privacy in such a place.  See Maryland v. King, 569 U.S. 435, 462 (2013) ("The expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope.'") (alteration in original) (quoting Bell, 441 U.S. at 557). Moreover, there is no evidence that the officers conducted this photo session in a

31

public area which would have exposed the defendant to ridicule for unzipping his jump suit and exposing his tattoos.  See Schmidt v. City of Bella Villa, 557 F.3d 564, 573 (8th Cir. 2009) (no constitutional violation found when an arrestee was required to partially unbutton her jeans and photograph her own normally-concealed tattoo in private for identification purposes).

Applying the four factors from Bell v. Wolfish shows that there was no Fourth Amendment violation here.  If requiring a pretrial detainee to submit to visual inspection of his body cavities in Bell was reasonable under the Fourth Amendment, then the much less intrusive photography session here was also reasonable.  Therefore, the defendant's Motion to Suppress the photographs of his tattoos should be denied.

**B.**     **Motion to Suppress Statements [25]**

Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).  A two-part inquiry determines the admissibility of a confession or self-incriminating statement.  First, courts must determine whether the Miranda waiver was valid.  A defendant validly waives his Miranda rights only if the totality of the circumstances shows both of the following: (1) an uncoerced choice and (2) an awareness "of both the nature of

the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). "Waiver may be established even absent formal or express statements of waiver." United States v. Thomas, No. 4:13-CR-22-RLV, 2014 WL 793359, at *9 (N.D. Ga. Feb. 25, 2014). "In fact, 'a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police.'" Id. (quoting Berghuis v. Thompkins, 560 U.S. 370, 388-89 (2010)).

Second, even where the Government has complied with the requirements of Miranda, the Court must consider whether the confession or self-incriminating statements were voluntary. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). The Court must examine the "totality of the circumstances, including the details of the interrogation and the defendant's characteristics" when determining whether statements were voluntary. United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010). "The determinative question asked is whether there has been police overreaching." United States v. Bercoon, No. 1:15-CR-022-LMM-JFK, 2016 WL 9404865, at *8 (N.D. Ga. Nov. 1, 2016), R. & R. adopted, 2017 WL 3151291 (N.D. Ga. July 24, 2017). Factors the Court must consider include "the

33

defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003).

With regard to the first prong of this inquiry, the undersigned reports that Detective Stone read Mr. Meyung his Miranda rights, the defendant signed a waiver form outlining those rights, and that he "voluntarily, knowingly, and intelligently" waived those rights. Moran, 475 U.S. at 421. Hearing testimony and videotape evidence reflects that the officers spoke in a calm and conversational tone to the defendant and answered his questions. Moreover, Mr. Meyung indicated that he understood his rights as they were read to him and agreed to speak with the officers. Although the defendant may not have understood what the word "coerced" meant, it is clear that he was not coerced.

With regard to the second prong of this inquiry, the undersigned reports that Mr. Meyung's post-Miranda statements were voluntary and not the result of police overreaching. There is no evidence that the defendant was of low intelligence; indeed, he reported that he graduated high school and had attended a technical school. He had only been in custody of law enforcement for about one hour when the Miranda rights were shared with him. As noted already, the nature of the interrogation was low key and lacked any coercion. Additionally, officers used no

34

physical force against Mr. Meyung and made no promises or inducements to him. Mr. Meyung also signed a <u>Miranda</u> waiver form.  Although not conclusive, a signed <u>Miranda</u> waiver is considered strong evidence the defendant voluntarily waived his rights.  <u>See</u> <u>Bernal-Benitez</u>, 594 F.3d at 1319.

Mr. Meyung nevertheless contends that drowsiness prevented him from making a voluntary waiver of his rights.  Detective Stone did question the defendant in the middle of the night, but that was a choice made by Mr. Meyung; he could have waited until morning to be questioned, but he wanted to proceed.  Additionally, while Mr. Meyung may have nodded off just before the interview began, he was fully awake when it began and stayed awake through its conclusion, and he did not appear to be confused, irrational, or incoherent when questioned.   Purported sleepiness is not sufficient to render the defendant's statement involuntary.  <u>See</u> <u>Devier v. Zant</u>, 3 F.3d 1445, 1460 (11th Cir. 1993) (per curiam) (rejecting assertion that defendant's sleeplessness made his confession involuntary when that condition was not the result of affirmative action by the police and he did not appear confused, irrational, or incoherent when questioned); <u>Moore v. Dugger</u>, 856 F.2d 129, 132 (11th Cir. 1988) (confession obtained from defendant who had gone without food or sleep for preceding 25 to 30 hours was not involuntary).

Finally, the defendant argues that his statements were not voluntary because Detective Stone withheld information to induce him to submit to questioning and would not give him any information about the allegations against him until 20 minutes into the interview. Because the Supreme Court has foreclosed such an argument, this Court must as well. See Colorado v. Spring, 479 U.S. 564, 576-77 (1987) (noting it had "never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights," and holding "that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.").

Detective Stone's failure to inform the defendant of why he was being questioned is harmless, as the Supreme Court has made clear:

> [W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

<u>Moran</u>, 475 U.S. at 422-23 (internal citations and footnote omitted).  Accordingly, because Mr. Meyung was not coerced, and he had been informed that he could remain silent and request a lawyer, his post-<u>Miranda</u> statements should not be suppressed.

**III.   <u>CONCLUSION</u>**

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [25] and his Motions to Suppress Evidence [26, 27] be **DENIED**.

**SO RECOMMENDED**, this the 3rd day of January, 2024.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE